Nott, Ch. J.,
dissenting:
JVhen this claim was before the International Commission, the umpire decided that the Mexican Government was “bound to compensate the claimants for the losses which they suffered through the misconduct of the local authorities.” He also incidentally found that the local authorities had not afforded to the claimants “that protection and assistance which had been promised them by the Mexican Government and to which they were entitled by treaty.” In 1879 the diplomatic organ of the American Government, the Secretary of State, “ upon a renewed examination of the matter as laid before him. by the Mexican Government,” decided “ that the proper limits of the further consideration which the honor of the Government should prompt it to give to this award should confine the investigation *522 to the question of a fradulent exaggeration of the claim.” In other words, the Secretary of State decided that the acts of the Mexican officials to these American claimants were such as rendered the Government of Mexico responsible from an international point of view. This decision is rendered unequivocal and unquestionable by the fact that the President, upon the recommendation of the Secretary, then proceeded to deal with the claim upon the basis that the responsibility of Mexico for the acts and inaction of its officers was a question finally settled. He did this by paying out a portion of the award to the claimants and withholding only enough to meet the charge of “fraudulent exaggeration.”
The case therefore comes into this court with the international question determined by the umpire and the responsibility of the Mexican Government reasserted by the constitutional and proper diplomatic authority of the United States.
Referring now to the umpire’s determination of the preliminary question of governmental liability, it must be conceded ■ that at least one of the witnesses is shown to have been unworthy of belief, except so far as his testimony was corroborated by others, and that many of the alleged grievances were greatly, if not grossly, exaggerated. But the evidence now before the court still leaves a number of facts established as completely as they were supposed to be established by the umpire. The company did exist; it was formed by reputable business men for legitimate business purposes; there was no fraudulent design ab initio; they invested a large amount of money in the adventure; they bought these mines in Mexico; they transported to them costly mining machinery; they carried on through the designated years an actual mining business.
As regards the Mexican authorities, there are other things which also remain equally certain. The written orders of Soto, Mora, and Yaldespino, which were the only positive uncontro-verted evidence before the umpire of the interference of the Mexican officials and the evidence upon which he manifestly relied, remain as well established now as they were then. The superintendent was arrested and imprisoned. (The cause of his imprisonment may have been the personal indignation of the magistrate, as contended by the complainants, but nevertheless their witnesses show that the quarrel, if it was a quarrel, sprang out of the superintendent’s perfectly proper management *523 of the company?s property in Ms custody.) Mide trains were stopped ; military exactions were made; the civil authorities did interfere with the company’s management of its own mines; the company did finally abandon the property.
With these facts still in the record it can not be said that upon this, the main issue in the case, the umpire would certainly have come to a different conclusion. A judgment is not to be set aside because one witness is shown to have been mistaken or to be unworthy of belief or to have sworn falsely if there be evidence enough remaining to sustain the verdict. We may now be satisfied that the witness G-ranger, an important witness for the claimants, was utterly unworthy of belief and much of his testimony false. But he stood contradicted and impeached by himself before the umpire. His subsequent testimony had been taken by the Mexican Government in the form of four'affidavits at different times and was in the case. Nevertheless, the umpire made his award.
As to the action of the Secretary of State upon the same question in 1879, it is sufficient to say that substantially everything which is in the case now was before him then. That is to say, the letter book of the company’s agents and the letters of the treasurer in New York were before him; and they were then untainted by the suspicion of having been tampered with or of being imperfect or incomplete. Yet with this evidence before him, evidence which he could not disregard and did not disregard, and which so far affected his mind as to lead him to the conclusion that a prima facia case of fraudulent exaggeration had been made out, he decided upon the international question that the action of the Mexican authorities was an infraction of the rights of American citizens in Mexico, and that for them the Mexican Government must be held responsible.
The complainants contend that the abandonment of the property in Mexico was not caused by the acts of the Mexican officials, but was voluntary, because of the worthless character of the mines and the losses which the business had brought upon the company. Great reliance is placed upon some letters of the treasurer and upon an admission he made in his testimony before a committee of the Senate and upon the inaction of the company in New York. The secret motives of men are something not easy to be established by evidence, and are dis *524 tinct from wbat the law knows as an intent. It-may be doubted whether the personal motive and intent of an officer or director can be given in evidence against a corporation. He may have thought it best to abandon the undertaking for financial reasons, but other stockholders may have thought otherwise. If it could be shown by the comjdainants that the company, at a meeting of its directors or stockholders, had resolved to abandon the enterprise and wind up the business, and recall the superintendent, and save such remnants of property as could be brought away, that would be one thing, and it might be that it would relieve the Mexican Government from a claim for damages, notwithstanding the acts of their officials. But in this case the record discloses another and different thing, viz, that the company took no such action; that they continued to instruct their superintendent to carry on the work as best he could; that they did not recall him; that they did not authorize an abandonment, and that they ultimately lost their property in Mexico by the operation of Mexican laws and the acts of Mexican citizens. The Secretary of State probably held that when a foreign power is guilty of acts which are a sufficient cause for American citizens to abandon their property and leave the country, and those acts are followed by such abandonment, the foreign power can not be permitted to say that it was in consequence of another cause or for another reason.
And here it should be noted that the jurisdictional statute followed the decision of the Secretary of State, and was in furtherance of his views, as may be seen in its preamble. The action of the President and the act of Congress must be construed with reference to each other, and the later, especially, with reference to the earlier. For the President to believe that the Mexican Government might be wholly exonerated, and the award be wholly and absolutely invalidated for fraud, and the claimants ultimately be held to be entitled to nothing, and the Mexican Government be adjudged entitled to have the whole of the award returned to it, and then for the President, so believing, immediately to pay away one-third of it to these same claimants would be foolishness. Such inconsistency can not be attributed either to the President or to the Secretary of State. Neither can it be supposed that in a transaction international in its character Congress intended that the judiciary *525 should review the decision and action of tbe diplomatic branch of the Government and undo what it had done, and subject the President and Secretary of State in their dealings with a foreign power to the implied censure of American courts. Nor can it be supposed that Congress intended to create by impli ■ cation a possible equitable liability on the part of the United States to Mexico.
For if the judiciary should decide that the Mexican authorities were not guilty of the acts complained of, and that the company did not abandon the property because of those acts, and should declare the award to be void, wholly and absolutely, then it must follow that when the President and Secretary of State, with the same evidence of fraud before them, paid away $240,683 to the claimants, it was a wrong done to Mexico; and the United States will then be in the dilemma of either leaving this wrong to Mexico unredressed or of making good the loss from their own Treasury. The statute does not provide for such a liability, nor contemplate it, and nations in international controversies do not submit their own diplomatic acts to such censure. It is indeed inconceivable that the United States, through their legislative branch of the Government, should have intended that the United States should come into their own courts as a litigant, there to allege and maintain that the U nited States as an international power had committed a wrong against another Government.
It has been repeatedly held that the terms of these jurisdictional statutes, no matter how broad they may be, must not be interpreted so as to impose a liability upon the United States where none may have been intended, and that in the construction of such statutes a claim must not be allowed to have meant one thing when it was before Congress and another thing when it comes into court. (United States v. Cumming, 130 U. S. 452.) If in 1879 the Mexican- Government had produced and lodged with the Secretary of State evidence, prima facie, to show that the written communications or orders of the Mexican officials upon which the umpire relied were forgeries, and if the President had then withheld the whole amount of the award to await the investigation and determination of the charge of fraud and forgery, a case would have been made which would justify the construction now given to the statute by the counsel for the complainants. But no such case existed; *526 no such charge was made; no imputation of forgery has arisen in the trial of the case; and the language of the Secretary of State, and the action of the President have never been disavowed. The terms of the statute are broad, but, as in other cases, they must be restricted to the facts and limited to the claim as it existed when the act passed.
From these consideratibns it appears clear that the present case must be considered as the Secretary of State put it, as one of fraudulent exaggeration. The questions, then, are, What did the umpire allow1? What are the items of the award which were obtained by fraudulent practices'?
The claimants before the International Commission set up a wildly exaggerated demand for $3,000,030, and their witnesses testified in much the same way; and on the argument before this court the case has been treated much as if the umpire had allowed what these exaggerated statements called for. But such is not the award which is now the subject of consideration. The umpire rejected all conjectural damages and reduced his award to the following five items:
From subscriptions and sales of stock. $235,000.00
Lent and advanced. 64,291.06
Due for rent, expenses, salaries, law expenses. 42,500. 00
Amount derived from reduced ores. 17, 000. 00
Ore extracted from the mines and deposited at the mills. 100, 000.00
Total,. 458,791.06
To the first four items the umpire attached interest at 6 per cent from March 20,1868, to the date of the final award, and to the fifth item interest from March 20,1869.
As to the first three of the above items, the bill does not charge fraud; as to the fourth, it charges that the amount derived from the reduction of ores “ was only $420.09, instead of $17,000 as sworn by the said Bxall and allowed by said umpire.” As to the fifth item, it charges that instead of the unreduced ores abandoned at the mines “being worth $100,000, as estimated by the said umpire from conflicting statements of witnesses from said defendant conrpauy and allowed by the said umpire in his said award, said ores were absolutely worthless.” The case is therefore narrowed down to the question whether the fourth and fifth items of the award were “obtained by fraud.”
This question brings us to a consideration of the evidence.
In 1878 the Mexican Government produced and identified the *527 letter book of the company kept at Tayoltita and certain letters from Garth, the treasurer in New York, to Exall, the superintendent in Mexico, and from Exall to Granger. Two years had then elapsed since the final award of the umpire had been rendered; andón this book and these letters the Mexican Government rested its charge that the award had been obtained by fraud and perjury. After this suit had been begun the Mexican Government also produced, in 1894, certain of the books of account which the company had kept at Tayoltita. .
Intrinsic and extrinsic evidence shows that the letter book was incomplete. This is to say, internally there are marks of mutilation, and the correspondence shows that letters were written and received and answered which do not appear to be in the book; and these missing letters coincide more or less with the mutilations in the book. The same thing is true of the letters from Garth, in New York, to Exall, in Tayoltita. That is to say, it is manifest that these are not all of the letters which Garth wrote and which Exall received. The books of account are also incomplete. The most important, the journal, is but a fragment of the entire book, while the other books of the same age and manufacture, and left in the same custody, are in good order. The ore book, showing by daily record the quantities of ore excavated, is not produced or accounted for.
It appears that all of the books and papers of the company were left in the possession of and under the control of James Granger, at the company’s offices in Tayoltita, by Exall, the superintendent, when he left the mines, in 18G8. When the Government of Mexico produced the letter book and letters of Garth and Exall in 1878, no evidence was given to account for them, to show the condition in which they were when received; to show in whose custody they had been; to explain why they had not been brought before the International Commission.
It has been urged by the complainants that the Mexican Government was not chargeable with knowledge of the fact that these books were within its own territory and presumably within the reach of the process of the Mexican courts; and it may be that as Governments are not liable for the laches of their agents, this court should not hold a Government to the same exercise of vigilance and diligence which would be required of an individual suitor. But there are some facts appearing on the record of the case as it stood before the *528 umpire which are beyond, the scope of the complainant’s argument.
On the 14th day of May, 1870, Granger, as a witness for the company, produced before the United States commercial agent at Mazatlan the five orders from Mexican civil and military officers which constituted the vital evidence of the company’s case in the hearing before the International Commission. These papers necessarily came from the office of the company and were a part of the mass of papers left in Granger’s possession by Exall, and of which he was thenceforth the only known custodian. The Mexican Government was thereby informed that jiapers of the company existed, and that there was a person, exercising a power of custody over them, and that that person was a resident within the territory of Mexico. This testimony, however, was ex parte. The Mexican Government had no opportunity to cross-examine, and if the case had stopped at thatpoint would be free from the imputation of laches or neglect.
But fifteen months afterwards, August 23, 1871, Granger, who had twice testified for the company, reversed his policy and his testimony and became a witness for the Government of Mexico. On the 6th of October, 1871, he was a second time called as a witness by the Mexican Government. On the 23d of July, 1872, he for the third time testified for the Government, and on the 25th of July he gave his testimony for the fourth time. In this last deposition, in answer to the question, “What position or employment did you have in the mining' establishment of Abra % ” he replied, “At first I was a dependent or clerk; afterwards, when the superintendent, Carlos H. Exall, left, I remained in charge as his representative.” Therefore, before the case was submitted to the International Commission, it was apparent upon its record that papers and documents of the company existed in Mexico, and that they were in the hands of a friendly witness.
Furthermore, it appears from the evidence now before us that the Mexican Government agreed to pay Granger $3,500 in consideration of his producing evidence which should lead to the setting aside of the international award. Granger thereby became jointly interested with Mexico in the result, and as much interested in spoliating and withholding records as if the proceedings were an individual suit on his own behalf to recover $3,500. Furthermore, it appears he was an unscru *529 pulous character, who changed bis testimony to suit his employers, and who produced from the archives of the company papers on one day for the one party and on another day for the other. Furthermore, it appears that he was an accomplished bookkeeper and a man of unusual ability. Finally, it appears that he had been the bookkeeper and accountant of this same company, familiar with all of its transactions in Mexico, and with all of its litigation before the International Commission, and that he knew precisely what to produce and what to withhold.
The Government of Mexico undoubtedly has produced all of the books and papers which it received from Granger, and in the condition in which they came to its possession. But they, with the other books and papers of the company, were for ten years in the possession of Granger. He was not subjected to examination and cross-examination in regard to them; they came from him in a mutilated and incomplete condition; he had a direct personal interest in producing those which would make for the complainant’s case and in suppressing those which would be adverse to it. Omnia prsesumuntur contra spoliatorem.
It is true that Granger, when testifying for the company in May, 1870, said, “I can not, without access to the books of the company, in New York, state the exact amount of money paid out by the company, as the hacienda has long since been sacked of books, receipts, invoices, and other papers furnishing the necessary data upon which to make anything like an exact statement on the subject.” But he had previously produced the letter of Colonel Yaldespino and had testified that it had come into his possession as clerk of the company; and he had also produced the orders of Mora, the jefe politico of the district of San Dimas, and of Soto, the juez conciliador, or judge, at Tayoitita, and had testified that he had received them as clerk of the company and had filed them away with other papers of the kind, and had subsequently turned them over to the attorney of La Abra Company. A year later he had become the witness of the Mexican Government, yet the Government apparently made no effort to pursue the subject and ascertain what books and papers he still had or learn from him or any source what had become of them.
Nevertheless, it seems clear, from evidence which may properly be considered, that the two items of the award now under *530 consideration — $17,000 derived from reduced ores and $100,000 forores extracted from tbe mines and abandoned — were obtained by fraud and perjury.
These two items must have rested upon tbe testimony of Exall, tbe superintendent, and Granger, tbe bookkeeper. Tbe one testified that tbe abandoned ores must have amounted to from 900 to 1,000 tons, wbicb “would have yielded tbe company, above tbe cost of reducing them to silver, in my opinion, one million of dollars;” and tbe other testified that about 7,000 car-gas, “ a little over 1,000 tons,” bad been taken out and were abandoned. There were other affidavits cumulative, or perhaps corroborative, but it can not be supposed that a man of Sir Edward Thornton’s ability, sagacity, and experience attached any importance to tbe ex parte affidavits of ignorant Mexican miners taken before an American consul, affidavits wbicb, in tbe opinion of those who gave them, could have been invested with tbe obligations of neither law nor religion.
Granger bad already contradicted himself when the case was before tbe umpire, having sworn on tbe 6th of October, 1871, “that tbe greater part of tbe ore taken out by tbe company is still in tbe patia of tbe hacienda, and that it is good for nothing.” As this testimony of his was not believed by Sir Edward Thornton, and as be expressed regret that tbe books of tbe company bad not been produced, it is manifest that be came to a reluctant conclusion upon these items of tbe award, and depended wholly upon Exall. This becomes tbe more apparent when we find that be adopted as tbe amount of money derived from reduced ores the exact figures given by Exall — $17,000. In a word, if tbe testimony of Exall and Granger drop out of tbe case, these two items of tbe award must fall.
It has already been said that Granger discredited himself and was disbelieved by tbe umpire. But Exall’s testimony remained and was relied upon. Tbe letter book before spoken of, though it may be impeached as a whole and may not bind tbe company as a record of events, does contain letters of Exall utterly at variance with bis testimony. It was bis right as a witness to be confronted with these letters and allowed to explain them before they could be put in evidence to contradict bis previous testimony. He bad died when tbe case came into this court, but before that be bad been to all intents and purposes confronted with tbe record of bis correspondence. Tbe *531 counsel for the company, after having seen in Washington a printed copy of the letter book, called upon Exall and stated to him the nature of the letters which had been discovered by the Mexican G-overnment and asked for his explanation.
Exall then made a statement, verified by his affidavit, in which he virtually swears to his own infamy; and that statement has been introduced as evidence in the case by the respondents. Throwing the letters aside and taking the statement in connection with other evidence in the case, it seems incontrovertible that when he testified that the abandoned ores “would have yielded the company, above the cost of reducing them to silver, $1,000,000,” and that “ about $17,000,” derived from beneficiated ores, “was put into the general fund of the company and used in said works immediately before we were compelled to leave,” he was giving testimony which he knew to be false. The testimony of the other witnesses may have operated to some extent upon the mind of the umpire, and upon their testimony he might have ascribed some value to the abandoned ores, but without Exall and Granger it would have been impossible for him to make these particular awards of $100,000 and $ 17,000. In a word, the testimony of Exall is the basis upon which the amounts allowed by the umpire rest, and when it drops out of the case as false, the two items of award fall with it.
The following are the conclusions which I have reached:
1. The terms of the jurisdictional act are broad, but the power actually conferred is limited. The preamble recites the investigation of the Secretary of State and the action of the President, and indicates that the legislative is to be but a continuation of the executive policy. The first section contemplates a suit which may go to the full length of declaring that the entire award of the umpire was obtained by fraud, but this section relates only to the duties of the Attorney-General and not to the powers or duties of the court. The remedial portions of the statute bring the case back to the fund remaining in the hands of the Secretary of State, the utmost power awarded to the court being to decree that that fund shall either be returned to Mexico or paid to the original claimants. It is manifest that the fund is the entire subject of the suit; that the United States have no interest in the suit except that of trustee or custodian, and that Congress never intended *532 that they should sue themselves in this court aud recover a judgment against themselves for the benefit of Mexico.
2. But if it be conceded that the decision of the court may go to the full length of “determining” that the entire award of the umpire was obtained by fraud, it would not follow that the court can redetermine the international issue. And if it be conceded that the complainants can make a new claim here differing from the claim reported by the Secretary of State, the claim for exaggerated damages, and attack the international decision of the umpire, it would not follow that they can retry the same issue. On the contrary, there is but one way by which they can have the international question reexamined, and that way is by alleging and proving that the orders and letters of the Mexican officials upon which the umpire relied, and which made the international case presented to him, never existed, and that the award was obtained by fraud effectuated, not by . perjury, but by forgery.
3. It may also be conceded that the complainants might have shown, within the intent of the statute, that the entire award was obtained by fraud, notwithstanding that a portion of it has been paid to the defendants, and notwithstanding* the limited decree which the court is empowered to render; but there was only one way m which they could have done that, and that way was by alleging and proving that the stockholders of the company never advanced any money in the enterprise; that there never were sales of stocks or subscriptions paid in amounting to $235,000; that no one lent and advanced to the company $64.291.06; that there was not due for rent, expenses, and salaries, $42,500; that $17,000 was not derived from reduced ores, and that the ores extracted from the mines and deposited at the company’s mill were wholly valueless. That is to say, if the complainants could have shown that the whole enterprise was a fraud from the beginning; that there was no money whatever invested by the stockholders of the company; that the alleged subscriptions and payments were false and fraudulent; that adventurers purchased the mines with the worthless stock of a worthless company; that they operated the mines by means of credit obtained or money borrowed from Mexican citizens; that, in short, they advanced nothing and lost nothing, then the complainants would have made out their case as to the whole of *533 tbe award. But wbat they might have done directly they can not do by indirection, by reopening tbe international controversy and unsettling that which has been settled both by the award of the umpire and the decision of the President. The question for this court to determine is not whether Mexico was or was not blameless, but whether this specific award of the umpire, item by item, in whole or in part, was or was not obtained by fraud.
4. Under his primary decision that the Mexican Government must be held responsible for the acts of its officials, the umpire decided that the company should recover not the millions which it was seeking as the value of the property and the profits which it might have made, but simply the amount of its expenditures and liabilities and the supposed value of the extracted ores. This was the umpire’s rule for the measure of damages. It may not have been the rule which this court would apply to a similar case, but it was his rule, and it can not be reviewed of questioned here, and it became the law of the case as completely as if it had been written in the treaty. Accordingly, it must now be held that what the company did recover was what it was entitled to recover, unless the complainants have shown that one or the other of the specific items, in whole or in part, was obtained by fraud effectuated by perjury.
The complainants not having attacked the first three items, they must stand; the fourth was fraudulently exaggerated, and it should be reduced to $420.09; the fifth has been utterly •overthrown.